*Appeal Nos. 20-72749 (Consolidated with 20-71765 (L) and 20-72734)*

## UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

CITY OF BOSTON, MASSACHUSETTS, et al.

Petitioners,

v.

FEDERAL COMMUNICATIONS COMMISSION and UNITED STATES OF AMERICA,

Respondents.

ON PETITION FOR REVIEW OF AN ORDER
OF THE FEDERAL COMMUNICATIONS
COMMISSION

## REPLY BRIEF OF PETITIONERS

Cheryl A. Leanza
BEST BEST & KRIEGER LLP
1800 K Street NW, Suite 725
Washington, DC  20006
(202) 785-0600

Gail A. Karish
BEST BEST & KRIEGER LLP
300 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
(213) 617-8100

*Counsel for Petitioners  in Case No. 20-72749*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................iii

SUMMARY OF ARGUMENT .................................................... 1

ARGUMENT ............................................................................. 3

I.   NO READING OF THE STATUTE, RULES OR POLICY
     CAN JUSTIFY UNLIMITED INCREASES IN THE SIZE
     AND NUMBER OF CABINETS AS AN INSUBSTANTIAL
     CHANGE. ......................................................................... 3

     A.   The FCC Articulates No Identifiable Limit on Additional
          Cabinets......................................................................... 4

          1.   The text of the rule does not justify the FCC's
               unreasonable interpretation. ...................................5

          2.   Insubstantial cannot reasonably mean the maximum
               change physically possible. ............................................7

          3.   The court cannot defer to the FCC brief's explanation
               of "substantial." ............................................................. 10

     B.   The FCC's Choice of Declaratory Ruling Cannot Excuse
          Arbitrary and Capricious Decision-making or Defective
          Process. ................................................................................. 12

II.  THE FCC DOES NOT DESERVE DEFERENCE FOR ITS
     NEW, ARBITRARY AND SURPRISING RULE
     REQUIRING EXPRESS EVIDENCE OF STEALTH
     CONCEALMENT, AESTHETIC OR OTHER CONDITIONS. ...... 14

     A.   The FCC Receives No Deference Under *Kisor* because It Has
          No Zoning Expertise and Its Ruling is Unfair. .................... 14

          1.   The FCC does not receive *Auer* deference under *Kisor*.
               ................................................................................. 15

          2.   The FCC does not receive *Skidmore* deference. .......... 17

          3.   The FCC's process did not eliminate unfair surprise. 18

     B.   The Deficient APA Process Caused Harm and Produced an
          Arbitrary and Capricious Result. ........................................ 21

51340.00001\41144100.4

1.      The FCC failed to consider alternatives, explain how its ruling addresses the record, or explain its change in position as required by the APA. ...............................22

2.      Two weeks to comment on a unpublished draft order does not constitute notice and comment under the APA .............................................................................24

III.    THE FCC'S INTERPRETATION OF CONCEALMENT AND ITS SHOT CLOCK RULING ARE ARBITRARY AND CAPRICIOUS. ..............................................................29

A.      The FCC Does Not Acknowledge a Change or Explain its Reasons for its Concealment Ruling. ....................................29

B.      The FCC's Shot Clock Ruling Arbitrarily Permits Automatic Approval of Modifications Without Compliance with Safety Rules and Standards. ..........................................32

IV.     THE COURT SHOULD VACATE THE FCC'S RULING. ............34

CERTIFICATE OF SERVICE ................................................................35

CERTIFICATE OF COMPLIANCE ........................................................36

51340.00001\41144100.4

# TABLE OF AUTHORITIES

## Cases

*American Min. Congress v. U.S. E.P.A.*,
  965 F.2d 759 (9th Cir. 1992) ................................................................ 9

*Auer v. Robbins*,
  519 U.S. 452 (1997) ........................................................................... 12

*Center for Biological Diversity v. Haaland*,
  998 F.3d 1061 (9th Cir. 2021) .......................................................... 31

*Center for Biological Diversity v. National Highway Traffic Safety
  Admin.*, 538 F.3d 1172 (9th Cir. 2008) ........................................... 23

*Citizens Telecommunications Company of Minnesota, LLC v. FCC*,
  901 F.3d 991 (8th Cir. 2018) ............................................................ 25

*Cohn v. Cnty. Bd. of Sup'rs of Los Angeles Cnty.*,
  135 Cal. App. 2d 180 (1955) ............................................................ 16

*Community Hosp. of Monterey Peninsula v. Thompson*,
  323 F.3d 782 (9th Cir. 2003) ............................................................ 18

*Department of Homeland Security v. Regents of the University of
  California*, 140 S.Ct. 1891 (2020) .................................................... 13

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ..................................................................... 23, 24

*HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*,
  141 S.Ct. 2172 (2021) ........................................................................ 8

*Kisor v. Wilkie*,
  139 S.Ct. 2400 (2019) ................................................... 12, 17, 20, 23

*Life Technologies Corp. v. Promega Corp.*,
  580 U.S. 140 (2017) ........................................................................... 9

iii

*Los Padres ForestWatch v. United States Forest Service,*
   25 F.4th 649 (9th Cir. 2022) ............................................................ 24

*Montgomery Cnty., Md. v. FCC,*
   811 F.3d 121 (4th Cir. 2015) .................................................... 10, 29

*Montgomery Cnty. v. FCC,*
   863 F.3d 485 (6th Cir. 2017) ............................................................ 11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) .......................................................... 13, 14, 23

*National Lifeline Association v. FCC,*
   921 F.3d 1102 (D.C. Cir. 2019) .................................................. 25, 26

*North Carolina Growers' Ass'n, Inc. v. United Farm Workers,*
   702 F.3d 755 (4th Cir. 2012) ............................................................ 26

*Perez v. Mortg. Bankers Ass'n,*
   135 S.Ct. 1199 (2014) ...................................................................... 21

*Pierce v. Underwood,*
   487 U.S. 552 (1988) .......................................................................... 9

*Prometheus Radio Project v. FCC,*
   652 F.3d 431, 453 (3rd Cir. 2011) .............................................. 26-27

*Public Citizen v. Nuclear Regulatory Com'n,*
   573 F.3d 916 (9th Cir. 2009) ...................................................... 20, 21

*Romero v. Barr,*
   937 F.3d 282 (4th Cir. 2019) ............................................................ 21

*SEC v. Chenery Corp.,*
    318 U.S. 80, 95 (1943) (*Chenery*) ................................................ 6, 8

*Skidmore v. Swift & Co.,*
   323 U.S. 134 (1944) ........................................................................ 18

*Sprint Corp. v. FCC,*
   315 F.3d 369 (D.C. Cir. 2003) .................................................... 22, 28

iv

*Sprint PCS Assets, L.L.C. v. City of Palos Verdes Ests.*,
   583 F.3d 716 (9th Cir. 2009)..............................................................30

*Texaco Inc. v. United States*,
   528 F.3d 703 (9th Cir. 2008)...........................................................10

*Time Warner Cable Inc. v. FCC*,
   729 F.3d 137 (2d Cir. 2013) ............................................................27

*U.S. v. Mead Corp.*,
   533 U.S. 218 (2001)...........................................................................18

*University of Texas M.D. Anderson Cancer Center v. United States
   Department of Health and Human Services*,
   985 F.3d 472 (5th Cir. 2021)................................................................5

*Western Watersheds Project v. Kraayenbrink*,
   632 F.3d 472 (9th Cir. 2011)..............................................................23

## Administrative Decisions

*In re Acceleration of Broadband Deployment by Improving Wireless
   Facilities Siting Policies*, 29 FCC Rcd. 12865 (Oct. 17, 2014),
   *amended* 30 FCC Rcd. 31 (Jan. 5, 2015), *aff'd Montgomery Cty. v.
   FCC*, 811 F.3d 121 (4th Cir. 2015) ..........................................4, 30, 32

*In the Matter of Implementation of State & Local Governments'
   Obligation to Approve Certain Wireless Facility Modification
   Requests Under Section 6409(a) of the Spectrum Act of 2012*,
   Declaratory Ruling and Notice of Proposed Rulemaking,
   35 FCC Rcd. 5977 (2020) .......................................................... *passim*

## Statutes

5 U.S.C. § 706(2)....................................................................................33

47 U.S.C. § 1455(a)(1)..............................................................................4

**Regulations**

47 C.F.R. § 1.1203 ........................................................................ 25

47 C.F.R. § 1.6100(b)(7)(i) ............................................................ 6

47 C.F.R. § 1.6100(b)(7)(i)(A) ...................................................... 6

47 C.F.R. § 1.6100(b)(7)(iii) ....................................................... 5, 6

47 C.F.R. § 1.6100(b)(7)(vi) ........................................................ 15

47 C.F.R. § 1.6100(c)(4) .............................................................. 31

**Other Authorities**

3 Rathkopf's The Law of Zoning and Planning § 61:49 (4th ed.) ........... 16

4 Rathkopf's The Law of Zoning and Planning §69:6 (4th ed.) .............. 16

Brief for Respondents at 24, *Montgomery Cty. v. FCC*,
    863 F.3d 485 (2017) (Nos. 08-3023, 15-3578) (filed April 29, 2016),
    available at  https://www.fcc.gov/document/brief-fed-respts-
    montgomery-cty-v-fcc-usa-6th-cir .................................................... 11

California Land Use Practice § 7.34 (Cal. CEB 2022) ........................... 16

Federal Communications Commission, Press Release, *FCC Chairman
    Pai Takes First Step to Increase Transparency of Rulemakings* (Feb.
    2, 2017),
    https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0202
    /DOC-343300A1.pdf ....................................................................... 25

51340.00001\41144100.4

## SUMMARY OF ARGUMENT

Respondent Federal Communications Commission (FCC or Commission) failed its obligation on multiple counts. It used a legally deficient process to pursue an impermissible goal: changing its rules without the procedures and considerations required by the Administrative Procedure Act (APA) as governed by *State Farm*. The Commission did not only fail procedurally; substantively, its decision is arbitrary and capricious.

In this Reply, Petitioners Boston *et al.* (Boston) show the FCC and Respondent industry intervenors (CTIA) do not overcome Petitioners' opening briefs which demonstrated that the FCC abused agency power, exceeded its statutory authority and produced an arbitrary and capricious result.

Specifically, neither the FCC nor CTIA can point to any meaningful limit in the *Ruling* on new cabinet deployments that distinguishes substantial from insubstantial changes as required by law. The FCC's interpretation is not justified by a close adherence to the rules' text. And the FCC's argument—that its rules, in effect, prohibit only a change that would exceed the physical maximum load able to be

1

born on a support structure—demonstrates its rule deprives the statutory term "substantially change" of all rational meaning.

Further, the FCC's decision to require "express evidence" of land use permit conditions does not deserve deference under the Supreme Court's decision in *Kisor* because the FCC did not claim or employ any expertise in land use permitting and because retroactively interpreting rules to avoid accountability and APA process is precisely the behavior warned against in *Kisor*. The FCC incorrectly claims valid APA notice based on an unpublished draft order with a two week opportunity for *ex parte* filings, a claim rejected by two other circuits. Further, Boston explains the express evidence ruling is arbitrary and capricious because it does not fit the problems complained of in the record or by CTIA on brief—it eliminates a wide range of permit conditions lawfully adopted and enforceable under state law which are not the *post hoc* conditions the FCC intended to address.

Boston *et al.* establishes that, among other flaws, the FCC and CTIA briefs demonstrate that the FCC's *Ruling* redefining concealment is arbitrary and capricious because it does not explain or acknowledge its changed decision. The shot clock rule can arbitrarily require federal

2

deemed granted approval of proposed modifications via expiration of the federal shot clock no matter whether they have demonstrated compliance with safety regulations.

Throughout, Boston explains that the FCC does not abide by the limits of any regulatory procedure, attempting to combine light touch interpretive procedures with the adoption of binding obligations. The FCC noticed a petition for declaratory ruling, which, by its terms, cannot propose rule changes, thereby limiting the scope of proposals parties could make in the record. Nonetheless, the FCC justifies the *Ruling* as full rulemaking compliant with the APA, even though it did not fully consider alternatives or justify changes as the APA requires.

Boston endorses the arguments on Reply of Petitioners League of California Cities *et al.* (LOCC Reply).

## ARGUMENT

### I. NO READING OF THE STATUTE, RULES OR POLICY CAN JUSTIFY UNLIMITED INCREASES IN THE SIZE AND NUMBER OF CABINETS AS AN INSUBSTANTIAL CHANGE.

In the decision under review, *In the Matter of Implementation of State & Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum*

*Act of 2012*, Declaratory Ruling and Notice of Proposed Rulemaking, 35 FCC Rcd. 5977 (2020) ("*Ruling*"), the FCC concluded that: 1) a small piece of equipment enclosed in housing did not count as a "cabinet" under the rules adopted in its *6409 Rulemaking*;[1] 2) wireless companies will receive automatic, streamlined approval of unlimited additional cabinets under Section 6409 as long as they are proposed as a series of changes. In neither case did the FCC consider whether these changes fell within the statutory constraint that, to be eligible for streamlined treatment, modifications may not "substantially change the physical dimensions of such tower or base station." 47 U.S.C. § 1455(a)(1).

## A.  The FCC Articulates No Identifiable Limit on Additional Cabinets.

Neither the FCC nor CTIA can point to any meaningful limit in the *Ruling* that distinguishes substantial from insubstantial changes as required by law. The FCC's interpretation is not mandated by the rules' text and would unquestionably permit streamlined approval of

---

[1] *In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, 29 FCC Rcd. 12865 (Oct. 17, 2014), *amended* 30 FCC Rcd. 31 (Jan. 5, 2015), *aff'd Montgomery Cty. v. FCC*, 811 F.3d 121 (4th Cir. 2015) ("*6409 Rulemaking*").

4

multiple, iterative changes resulting in massive increases in physical size contrary to statute.

      1.    The text of the rule does not justify the FCC's unreasonable interpretation.

The FCC cannot and does not argue that its interpretation is mandated by the rule's text. It claims that when 47 C.F.R. § 1.6100(b)(7)(iii) says "[f]or any eligible support structure, it involves…" the "it" refers to "[a] modification" in the opening of 1.6100(b), which the FCC concludes means the limitation applies to *each* proposed modification. It finds similar support in the rule's use of "new" equipment cabinets. FCC 47; CTIA 29-30. Petitioners interpretation, however, is equally likely: the FCC and CTIA do not address the meaning of "but not to exceed four cabinets." 47 C.F.R. § 1.6100(b)(7)(iii). The phrase means that, regardless of individual "standard number" limits for each request, the cumulative total is four. "But not to exceed" can impose a superseding cap on individual requests. *See University of Texas M.D. Anderson Cancer Center v. United States Department of Health and Human Services*, 985 F.3d 472, 481, n.5 (5th Cir. 2021).

5

The FCC tries to distinguish the height rules in subsection (b)(7)(i) from the cabinet rules in Subsection (b)(7)(iii) because "increase" must be relative to a baseline, FCC 49, but ground cabinets increases are limited by volume in relation to a baseline as well in Subsection (b)(7)(iii). So nothing about the meaning of the word "it" demands an individual vs. cumulative limit. The FCC also cannot explain how "it" in (b)(7)(iii), which addresses cabinets, must apply to each request, but a parallel construction in (b)(7)(i) imposes a cumulative limit on height. Subsection (b)(7)(i)(A) makes clear "it" does not mean *each* modification with regard to height, so the word "it" as a reference to "modification" cannot be the dispositive factor in interpreting (iii). 47 C.F.R. § 1.6100(b)(7)(i), (i)(A), (iii).

Nor is the FCC permitted to rebut Boston's argument that the rules do not have a defined meaning based on arguments made by commenters, FCC 48-49, but not addressed by the Commission in the *6409 Rulemaking. SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943) ("*Chenery*").

51340.00001\41144100.4

2. Insubstantial cannot reasonably mean the maximum change physically possible.

Because the rule's meaning is, at best, ambiguous, the FCC's interpretation must be reasonable. To be reasonable, it must be consistent with the statute. The FCC has no explanation whatsoever for its failure to consider the meaning of the statutory term in its *Ruling*. The FCC erroneously claims that volumetric limits on ground cabinets will constrain cabinets attached to the support structure, but the FCC clearly stated those limitations do not apply to support structure cabinets, only to ground cabinets. FCC 52 *cf. Ruling* n.85 (1-ER-19-20). It also erroneously claims that the FCC's decision to redefine "cabinet" to exclude small pieces of equipment encased in their own housing does not matter because "other substantial change criteria continue to apply." FCC 53-54. If small, housed pieces of equipment are no longer cabinets, the FCC's rules provide no constraint and the FCC does not explain how other criteria could do so. In fact, nothing limits small, housed equipment under the FCC's rules.

The FCC counters with an unsupported statement that the number of cabinets may not be "unusually large" with no indication as to what "unusually large" means. FCC 51-52. The FCC tries to

7

circumvent *Chenery* by resorting to arguments made by parties, not its own analysis, to counter Petitioners' concern as to the total physical increases permitted under the FCC's *Ruling*. FCC 50-52. Even so, the FCC, on brief, argues that an insubstantial change is actually the maximum load that could be physically squeezed on a support structure or a site, as a matter of engineering and space constraints.[2] FCC 52. This justification is not only absent from the FCC's *Ruling*; it also violates the statutory text. It admits that the FCC has converted a statute that limits streamlined approval to modifications that *do not substantially change physical dimensions* to mandating streamlined approval for *any change that is physically possible*. Congress limited the modifications which receive streamlined approval under Section 6409; the FCC cannot thwart that limit.[3]

---

[2] If the FCC's argument about small pieces of equipment, FCC 54, is referring to the maximum load limits as the other limiting criteria, the argument is even less applicable to small pieces of equipment as compared with cabinets.

[3] Moreover, the court should not grant, because the agency does not seek, *Chevron* deference for its interpretation—or lack thereof—of the statute. *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*, 141 S.Ct. 2172, 2180 (2021) (declining to consider *Chevron* deference when not invoked).

8

Considering the impact of cumulative increases is no mere hypothetical. *Contra* FCC 52. Agencies are required to consider "relevant factors" that can change the agency's rule. *American Min. Congress v. U.S. E.P.A.*, 965 F.2d 759, 771 (9th Cir. 1992). The meaning of the statutory text is the most important relevant factor. And the record contained significant evidence of the large size of cabinets and the consequences of unlimited sequential mandatory approvals of additional cabinets. Boston 40-41; *e.g.*, Wilmington Ex Parte Comments at 15-19 (2-ER-142-146); *infra* I.B.

CTIA claims Congress' use of the statutory term "substantial" is irrelevant, at 53-54, citing cases that recognize the term is ambiguous and in need of interpretation. Nonetheless, the courts in both cases concluded, in context, certain interpretations of the word were outside the bounds of the statute. *Life Technologies Corp. v. Promega Corp.*, 580 U.S. 140, 146 (2017) (substantial is quantitative); *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (substantial means "justified in substance or in the main").

Substantial also must have a meaning in Section 6409 besides "unlimited": imprecision of the term does not empty it of any meaning.

Here, the expert agency has found the addition of a cabinet that is ten percent larger is "substantial." The FCC also imposed a four-cabinet limit. The Fourth Circuit, contrary to CTIA's view, upheld "a numerical definition of substantiality" that took context into account, but did not permit a case-by-case evaluation of substantiality. *Montgomery Cnty. v. FCC*, 811 F.3d 121, 130 (4th Cir. 2015) ("*Montgomery Cnty.*"). The FCC cannot squire this analysis with a concomitant decision that unlimited changes deserve streamlined, virtually automatic, approval. The FCC must impose an outer limit, otherwise Congress' use of "substantially change" is rendered surplusage. *Texaco Inc. v. United States*, 528 F.3d 703, 708-09 (9th Cir. 2008) (quoting *TRW Inc. v. Andrews*, 534 U.S. 91, 31 (2001)).

      3.    The court cannot defer to the FCC brief's explanation of "substantial."

Respondents' defense of the cabinet rule further underscores why the FCC's unreasonable decision deserves no deference. The FCC attempts to defend its decision by turning to parties' positions on the record, stating there are "'practical 'constraints on the number of [cabinets] on a structure.'" FCC 52 (quoting CTIA Reply Comments at 18-19 (SER-71-72)). The Court should reject the FCC's contention that

practical engineering and space constraints mean the FCC's interpretation fall within the statute's bounds. The FCC has tried this tactic before, assuring the court that the FCC's rules are not as extreme as petitioners allege and obtaining a favorable court ruling premised on the FCC's explanation—and then reversing course.[4] In a posture very similar to this case, the Sixth Circuit reviewed a modification to federal cable rules interpreting federal limits on local authority. The FCC successfully fended off a motion for stay of its original decision, explaining that the rules did not apply as Petitioners had alleged. *Montgomery Cnty. v. FCC,* 863 F.3d 485, 490 (6th Cir. 2017). When the FCC later determined that the rules *did* apply in exactly the manner Petitioners originally claimed, the FCC pretended the rules had *never* meant what the FCC originally told the court. *Id.* When confronted with the agency's contemporaneous interpretation of its own rule in a brief before the same court, the Commission offered the same defense as it does here, "the Commission is not bound by prior positions taken by its lawyers." Brief for Respondents at 24, *Montgomery Cty. v. FCC*, 863

---

[4] Moreover, as explained in the LOCC Reply, part IV, this is not a hypothetical concern.

F.3d 485 (2017) (Nos. 08-3023, 15-3578) (filed April 29, 2016), available

at  https://www.fcc.gov/document/brief-fed-respts-montgomery-cty-v-fcc-usa-6th-cir; FCC 64 ("'staff level actions do not bind' the agency's

subsequent determinations") (citations omitted).

This behavior by a federal agency is untenable. The Court and

parties before it cannot function if it cannot depend upon the agency to

be consistent. As Boston explained, at 47-48, this is paradigmatic

example of when agencies should not be accorded deference under

*Kisor*: when the agency abuses deference and chooses to be

untrammeled by consistency or even the claims it makes to the federal

judiciary.

### B.   The FCC's Choice of Declaratory Ruling Cannot Excuse Arbitrary and Capricious Decision-making or Defective Process.

Even if the court were to determine it should defer to the FCC's

choices under *Auer v. Robbins,* 519 U.S. 452 (1997)*,* the lack of any

ultimate limit on the increases in physical size and number of cabinets

demonstrate the *Ruling* is arbitrary and capricious. Not only is its

reasoning internally inconsistent, but the FCC is wrong that APA

process requires nothing more than a bare notice and comment

12

opportunity, or that parties must demonstrate they did not have an opportunity to make particular arguments to prevail under the APA. FCC 33.  Declaratory rulings are reviewable under the APA and thus must meet the arbitrary and capricious standard. FCC 24.

In this case, the FCC "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("*State Farm*"). An agency's "reasoned analysis must consider the alternatives that are within the ambit of the existing policy." *Department of Homeland Security v. Regents of the University of California*, 140 S.Ct. 1891, 1913 (2020) (cleaned up). Specifically, on brief the FCC side-steps Boston's point, at 44-45, that the FCC did not evaluate the interplay between its redefinition of "cabinet" to exclude small pieces of equipment enclosed in housing. FCC 54. If equipment is not governed by the cabinet rules, it is almost impossible for equipment to be limited by tower height, excavation, concealment or other permit conditions. The FCC also did not consider the interplay between changing its view regarding the distinction between pieces of equipment and cabinets in determining

13

what would constitute a substantial change as it must under *State Farm*, 463 U.S at 46-49; Boston 44-45.

Moreover, it falls short as a rulemaking and the FCC's decision to use a declaratory ruling artificially cuts off options that Petitioners could have offered if the FCC had noticed a rulemaking rather than a declaratory ruling. For example, the FCC did not consider adopting a new rule to govern small housed equipment. It did not consider adopting a codified distinction between housed equipment and cabinets, leaving localities with vague concepts that result in vast differences in application of its rules. The harms from failing to use a rulemaking are evident. The FCC *could* choose to act using a declaratory ruling, but not to conduct a rulemaking disguised as a declaratory ruling, if it fails to engage in the full rulemaking analysis required. *Infra* II.B.

## II. THE FCC DOES NOT DESERVE DEFERENCE FOR ITS NEW, ARBITRARY AND SURPRISING RULE REQUIRING EXPRESS EVIDENCE OF STEALTH CONCEALMENT, AESTHETIC OR OTHER CONDITIONS.

### A. The FCC Receives No Deference Under *Kisor* because It Has No Zoning Expertise and Its Ruling is Unfair.

Prior to the FCC's *Ruling*, local governments relied upon the existing body of rules and case law in their jurisdictions to determine

when the conditions attached to a permit could be abrogated. Boston 48-51. After the *Ruling*, for a condition to survive a 6409 request under Section 1.6100(b)(7)(vi), a locality must contend with vague wording indicating that it must provide "express evidence that at the time of approval the locality required the feature and conditioned approval upon its continuing existence." *Ruling* ¶ 42 (1-ER-25). They further must produce "express evidence" that a stealth design was intended to look like something else. *Id.*, ¶38 (1-ER-23). This meaningless standard should not be affirmed because the FCC possesses no expertise in evidentiary standards for zoning conditions and the ruling is the product of unfair surprise.

        1.    The FCC does not receive *Auer* deference under *Kisor*.

Respondents' claim of *Auer* deference, FCC 24, 73, for the express evidence standard fails because the FCC does not have the expertise to determine what type of evidence is sufficient to demonstrate the continued efficacy of a land use permit condition. The FCC's lack of expertise is evident from its non-existent justification of the ruling and

lack of response to Petitioners concerns.[5] FCC 66-67. The FCC claims

the area of law is unsettled, FCC 71-77, but ignores the body of common

law and local regulation which already establishes that conditions

"must be clearly defined, so that both the permittee and the adjoining

landowners are not left in doubt as to what was intended." 3 Rathkopf's

The Law of Zoning and Planning § 61:49 (4th ed.). Thus CTIA's

argument, at 38-39, that the Ruling was required because otherwise

permits conditions would "not exist" is wrong. There is no need for any

new evidentiary standards. *See also supra* Part I.B.1.

"When the agency has no comparative expertise in resolving a

regulatory ambiguity, Congress presumably would not grant it that

authority." *Kisor v. Wilkie*, 139 S.Ct. 2400, 2417 (2019) ("*Kisor*"). In

*Kisor*, the Court favorably cited a Tenth Circuit case that did not defer

to a Federal Energy Regulatory Commission analysis of common law

---

[5] Moreover, CTIA does not argue in support of the temporal portion of
the FCC's interpretation of the rule, CTIA 36-41, 49-50, possibly
because it is well established that "[s]pecial use permits under zoning
ordinances run with the land [and] is available to any subsequent
owner, until it expires according to its terms or is effectively revoked…."
*Cohn v. Cnty. Bd. of Sup'rs of Los Angeles Cnty.,* 135 Cal. App. 2d 180,
185 (1955); 4 Rathkopf's The Law of Zoning and Planning §69:6 (4th ed.);
California Land Use Practice §7.34 (Cal. CEB 2022); Boston 50.

property terms. *Id.* (quoting *Jicarilla Apache Tribe v. FERC*, 578 F.2d 289, 292–93 (10th Cir. 1978)). The Court favors judicial interpretation of questions within a "judge's bailiwick," rather than an agency's, such as interpreting and applying state property and zoning law. *Id.* at 2417. Like the FERC, the FCC has no expertise with respect to the existing body of case law that determines the application of permit conditions. *Contra* FCC n.6. In its three paragraphs considering the question, the FCC did not display any expertise on this matter, nor did it even attempt to determine the current state of the law. *Ruling* ¶¶ 41-43 (1-ER-24-25).

Petitioners respectfully request that this Court vacate the *Ruling* requiring express evidence and conclude that existing state law as interpreted by the judiciary is the appropriate means to decide whether parties were on notice of a land use permit condition.

### 2. The FCC does not receive *Skidmore* deference.

Contrary to Respondents' claims, FCC 24, the FCC does not deserve *Skidmore* deference, which depends on "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give

17

it power to persuade, if lacking power to control." *U.S. v. Mead Corp.*, 533 U.S. 218, 228 (2001) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) ("*Skidmore*")); *Community Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 791 (9th Cir. 2003). Moreover, "[a]n agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *Id.* at 792.

The sum total of the FCC's analysis is the "basic principle that applicants should have clear notice of what is required by a condition and how long the requirement lasts," *Ruling*, n.123 (1-ER-25), which draws on no expertise or analysis and does not explain the meaning of "express evidence." It thus deserves no *Skidmore* deference.

3.    The FCC's process did not eliminate unfair surprise.

Contrary to CTIA's claim, at 51, the process used by the FCC did not eliminate unfair surprise. The FCC waded into local zoning and permitting to create confusion about decades of established legal precedent with no warning. The term "express evidence" did not appear in any pleading until the FCC released its draft order three weeks

18

before the final vote.[6] *Infra* II.B.2. Until the FCC released its draft

order, the FCC did not receive any comments about wireless companies

that claimed they did not know what conditions applied to their

permits. *E.g.*, Joint Comments of the City of San Diego, Cal, *et al.* (2-

ER-290); Comments of the National Association of Telecommunications

Officers and Advisors, *et al.* at 10 (2-ER-269).[7] The FCC and CTIA

cannot point to any proposal for any evidentiary standard regarding

continued application of permit conditions put forward by the industry

or the FCC.[8] FCC 32-33; CTIA 59.

---

[6] The FCC's draft order was released May 19, 2020, and on May 29 the City Manager of Lakewood, Washington made the first mention of the FCC's new "express evidence" standard. Letter from John Caulfield to Marlene Dortch, FCC, WT Docket No. 19-250 (filed May 29, 2020) (2-ER-166-167).

[7] The industry did complain that local government sought to enforce existing permit conditions when eligible facilities requests were sought, but did not complain land owners or wireless companies were unaware of their obligations. *E.g.*, AT&T Comments (filed Oct. 29, 2019) (IndustrySER-82-83).

[8] The WIA petition asked that the FCC clarify that the requirement to comply with conditions associated with the siting approval would block an eligible request only if the "proposed modification would cause non-compliance with prior conditions imposed on a structure or site. Importantly, *this clarification would not prevent localities from enforcing their codes and siting conditions*." WIA Petition at 15 (SER-165). The Petition asked that concealment conditions be clear "concealment elements are only those understood and expressly

19

None of the cases cited about unfair surprise, CTIA 51, were
decided after the Supreme Court narrowed *Auer* deference in *Kisor*.
Whereas in the cited cases, courts found agency interpretations of their
own rules were "controlling" unless "plainly erroneous," *e.g.*, *Public
Citizen v. Nuclear Regulatory Com'n*, 573 F.3d 916, 923 (9th Cir. 2009)
("*Public Citizen*"), *Kisor* made clear that only "reasonable"
interpretations will suffice. *Kisor*, 139 S.Ct. at 2415 (the "plainly
erroneous" test "may suggest a caricature of the doctrine, in which
deference is 'reflexive.'")

Unable to show the express evidence standard was articulated in
advance, CTIA argues surprise can be avoided if the FCC's new
interpretations were merely ascertainable from the history and context
of the FCC's prior *6409 Rulemaking*. CTIA 51. But CTIA does not cite to
any language, nor is there any indication, in the *6409 Rulemaking* that
the FCC might supplant or obscure existing land use evidentiary

_____

approved as such at the time of the original approval of the site…" WIA
Petition at 12 (SER-162). To be sure, parties debated whether localities
must label or designate permit conditions as being related to
concealment, but did not debate an "express evidence" standard, and
certainly not as it related to other permit conditions. *E.g.*, Reply
Comments of the City of San Diego, *et al.* at 69-70 (2-ER-209-10).

20

standards with new evidentiary standards. Moreover, the precedent CTIA does cite, *Public Citizen*, does not govern: the court used prior agency analysis to consider whether new rules were consistent with previous rules, not whether the new rules caused unfair surprise. *Public Citizen*, 573 F.3d at 924.  Longstanding agency inaction can cause unfair surprise. *Romero v. Barr*, 937 F.3d 282, 296 (4th Cir. 2019) (citing *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–57 (2012)).

### B.   The Deficient APA Process Caused Harm and Produced an Arbitrary and Capricious Result.

The FCC and CTIA deny the FCC adopted new rules, but in any event claim that, if all else fails, the *Ruling* should pass muster as a notice and comment rulemaking.[9] FCC 25, 33, CTIA 52.  It does not.

---

[9] The FCC also defends its decision here because it is an interpretive rule which does not require notice and comment under the APA. FCC 30. If the rules are upheld because they are interpretive only, they also "do not have the force and effect of law." *Perez v. Mortg. Bankers Ass'n*, 135 S.Ct. 1199, 1208 (2014). Petitioners disagree the Ruling is an interpretive rule, but Petitioners also respectfully request this Court take care to be explicit on this point if it affirms the agency. The FCC should not be permitted to impose a legislative rule with the light touch procedures of an interpretation.

51340.00001\41144100.4

1.    The FCC failed to consider alternatives, explain how its ruling addresses the record, or explain its change in position as required by the APA.

The express evidence ruling is arbitrary and capricious in light of the record, as demonstrated by CTIA's brief, at 57-59.[10] CTIA dedicates many pages making the case against imposition of new conditions after a permit is issued. CTIA 36-41, 48. But the FCC's *Ruling* about express evidence vastly exceeds a concern with *post hoc* permit conditions because it will eliminate many conditions imposed at the time of issuance. If the FCC had used a rulemaking proceeding, and determined it must adjust its rules to address localities that impose *post hoc* permit conditions, it would have had to explain why it did not adopt a rule more directly targeted to the problem. Alternatively, it would have had to explain why it did not adopt a new rule to do so. For example, in *State Farm*, the Supreme Court described NHTSA's error in

---

[10] CTIA incorrectly claims Petitioners waived logical outgrowth arguments. CTIA 56. "Logical outgrowth" is part and parcel of the judicial evaluation of adequate notice under the APA and the harmless error doctrine. *E.g.*, *Sprint Corp. v. FCC*, 315 F.3d 369, 376–77 (D.C. Cir. 2003) ("*Sprint Corp.*"). There is no question from the opening briefs that Petitioners and Intervenors complained of insufficient notice and explained the error was not harmless in their opening briefs. See CTIA 56 (citing LOCC 47).

22

failing to consider the alternative of mandatory airbags as compared with passive seatbelts. *State Farm*, 463 U.S. at 46-49; *Center for Biological Diversity v. National Highway Traffic Safety Admin.,* 538 F.3d 1172, 1193 (9th Cir. 2008). Petitioners were deprived of the full expanse of an APA rulemaking when the FCC changed issued its *Ruling. Kisor*, 139 S.Ct. at 2434 (Gorsuch, J., concurring).

Similarly, a key element of the APA obligation is to acknowledge a change and explain it. *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 495 (9th Cir. 2011); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But here the FCC did not acknowledge a change, depriving Petitioners of process and rational decision-making guaranteed by the APA.

Because the FCC was attempting to make a rule change without following the required APA procedure, it tied itself in knots "interpreting" the codified words rather than consider more sensible changes to the rule. Boston 53-54. Therefore, the flawed process is not a harmless error because it deprived Petitioners of FCC reasoning and analysis that would have occurred if the FCC had not artificially closed

off the possibility of changing the FCC's rules. *Id.* This is particularly concerning because the FCC now justifies its decision as a rulemaking.

And the rule is also arbitrary and capricious because, rather than directly addressing imposition of *post hoc* conditions, the FCC adopted a sweeping rule that will reach many, many conditions that were adopted with the original permit but that cannot meet the Commission's new evidentiary standard. The FCC's reasoning was limited to one sentence, that the FCC's new rule was based on the "basic principle that applicants should have clear notice." *Ruling* at ¶¶ 40-43, n.123. But "an agency's determination is arbitrary and capricious where it merely provides 'generic statements' to support its conclusion in lieu of evidence that it has actually applied its substantive expertise." *Los Padres ForestWatch v. United States Forest Service*, 25 F.4th 649, 657 (9th Cir. 2022).

> 2. Two weeks to comment on a unpublished draft order does not constitute notice and comment under the APA.

As two other circuits have found, and this court should find, the comments directed to the FCC's release of an unpublished draft order do not remedy the lack of a full APA process as the FCC claims.

51340.00001\41144100.4

FCC 33; *see also* CTIA 59-60. The Boston, Massachusetts comment cited by the FCC, at 33, was in response to the FCC's unpublished draft order, issued three weeks before the Commission vote and when only two weeks remained before the agency's sunshine rules prohibited further public comment.[11] Public Notice, Commission to Hold Open Meeting (June 2, 2020) (FER-3-4); 47 C.F.R. § 1.1203. Similarly, CTIA, at 59-60, cites many pleadings it claims anticipated the FCC's actions, but only two were submitted before the release of the draft order and none of those addressed evidentiary standards. This Circuit should affirm that a final opportunity to comment on the release of a draft order, not published in the federal register, is insufficient to cure any notice deficiencies under the APA. *National Lifeline Association v. FCC*, 921 F.3d 1102, 1117 (D.C. Cir. 2019) ("*National Lifeline Association*"); *Citizens Telecommunications Company of Minnesota, LLC v. FCC*, 901

---

[11] In 2017, the FCC began voluntarily releasing draft orders three weeks before a Commission open meeting and vote. Federal Communications Commission, Press Release, *FCC Chairman Pai Takes First Step to Increase Transparency of Rulemakings* (Feb. 2, 2017), https://transition.fcc.gov/Daily_Releases/Daily_Business/2017/db0202/DOC-343300A1.pdf. While this is a useful new practice, it cannot be permitted to side-step the APA.

25

F.3d 991, 1005-1006 (8th Cir. 2018); *see also Prometheus Radio Project v. FCC*, 652 F.3d 431, 453 (3rd Cir. 2011) ("*Prometheus Radio*").

The FCC insists parties must explain what they could have filed with more time. FCC 33. Not only is that untrue, *supra* I.B, but the FCC left itself with insufficient time to consider the comments filed in the two weeks before it voted so the opportunity to submit comments was inadequate.

The deficient notice combined with a brief period for *ex parte* comment after release of the draft order was not harmless error. *Contra* CTIA 57-59; LOCC 45-47. Because the "express evidence" standard was not enunciated until release of the draft order, parties had only two weeks to comment upon it. In contrast, the D.C. Circuit has found "a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment." *National Lifeline Association,* 921 F.3d at 1117. The Third Circuit rejected, as deficient, a vote that had occurred within a week of the response deadline and a draft order that was circulated before comments were received. *Prometheus Radio Project*, 652 F.3d at 453; *see also North Carolina Growers' Ass'n, Inc. v. United Farm*

26

*Workers*, 702 F.3d 755, 770 (4th Cir. 2012) (10 days insufficient for comment on rule suspension). In this docket, in the early months of the COVID-19 pandemic, with national protests occurring in streets, the FCC would not extend the comment period on the draft order when sought by local governments after it gave the public its first look at the new express evidence standard. LOCC 21-22; *Ruling* (1-ER-61-62) (Rosenworcel, dissenting); Local Government Associations Request letter (May 22, 2020) (FER-1-2). The purposes of notice and comment— to ensure an "exchange of views" while the FCC had an open mind, to test the proposed rule and develop evidence—was not fulfilled. *Prometheus Radio Project*, 652 F.3d at 449–50; *Time Warner Cable Inc. v. FCC*, 729 F.3d 137, 170 (2d Cir. 2013) ("general notice that a new standard will be adopted" insufficient) (citations omitted). The three paragraphs enunciating the express evidence standard did not evidence an open mind; they did not change after the draft order's release, except for the addition of one footnote stating the FCC's its new rule was based on the "basic principle that applicants should have clear notice." *Ruling* at ¶¶ 40-43, n.123 *cf.* Draft Order, ¶¶40-43 (SER-23-24). The FCC did

27

not cite on brief any filings that addressed the meaning of "express evidence" submitted before release of the draft order. FCC 73.

To permit the FCC to justify its flawed notice using the unpublished draft would provoke the exact harm forecast by the D.C. Circuit:

> broadening the harmless error rule would virtually repeal section 553's requirements: if the government could skip those procedures, engage in informal consultation, and then be protected from judicial review unless a petitioner could show a new argument—not presented informally—section 553 obviously would be eviscerated. The government could avoid the necessity of publishing a notice of a proposed rule and perhaps, most important, would not be obliged to set forth a statement of the basis and purpose of the rule, which needs to take account of the major comments—and often is a major focus of judicial review.

*Sprint Corp.*, 315 F.3d at 376–77. (quotation omitted).[12] The FCC may not be permitted to do so here.

---

[12] If the FCC were correct that the draft notice was sufficient, and the only means to successfully demonstrate the APA process was legally deficient was to note arguments Petitioners could not make if they had sufficient notice, it would counterproductively pressure parties not to share their concerns with the agency or lose their claim in court.

28

## III. THE FCC'S INTERPRETATION OF CONCEALMENT AND ITS SHOT CLOCK RULING ARE ARBITRARY AND CAPRICIOUS.

The FCC's other rulings are arbitrary and capricious because they are flawed in their analysis and do not fully take into account the record. And the FCC cannot defend them as harmless error because the FCC omitted considerations that must be included in an APA rulemaking.

### A. The FCC Does Not Acknowledge a Change or Explain its Reasons for its Concealment Ruling.

The FCC argues that its interpretation of "concealment" to mean "stealth"—*i.e.*, in disguise as something else—passes muster relying on detailed analysis of its rules and *6409 Rulemaking*. FCC 54-59. The FCC does not explain, however, how its *Ruling* surpasses the arbitrary and capricious standard under *State Farm*. In fact, its arguments on brief demonstrate the analysis that the FCC should have done as the product of a full APA rulemaking.

When the FCC originally adopted its rules on concealment, it found that the statute did not override all conditions on the appearance of wireless facility installations. *Montgomery Cnty.*, 811 F.3d at 131. Analogizing to building codes or noise ordinances, it found Congress did

29

not intend to exempt compliance with some conditions and that such a ruling was widely supported by industry and local governments alike. *6409 Rulemaking*, 29 FCC Rcd. 12865, ¶200, 202 12949-51, n.543 (2014). That decision makes sense: a complex antenna array or bright, reflective metal cabinet can make a substantial impact on a surrounding neighborhood. No one wants to see a spaceship in the middle of their desert vista. *E.g.*, *Sprint PCS Assets, L.L.C. v. City of Palos Verdes Ests.*, 583 F.3d 716, 725 (9th Cir. 2009).

The industry petitions which initiated the *Ruling* alleged that some concealment rules were being expansively interpreted to defeat the statute's purpose. If that were true—and Petitioners do not concede that they were—the FCC, under the APA, could have crafted a new rule to distinguish problematic concealment from concealment that was perfectly reasonable and consistent with the FCC's previous understanding of the rule, as explained to the Fourth Circuit. Boston 31-33. It did not. Instead it retroactively interpreted "concealment" to mean "disguised" which does nothing to address a bright silver mechanical structure that is now permitted to rise above a parapet or a wall under the FCC's new interpretation—with no process and no

30

additional conditions, because it is "deemed granted" within 60 days pursuant to federal law unless the wireless company neglects to submit sufficient information about the size of the structure. 47 C.F.R. § 1.6100(c)(4).

Under the *State Farm* precedent in this circuit, *Center for Biological Diversity v. Haaland*, 998 F.3d 1061, 1067 (9th Cir. 2021), the FCC must explain how its ruling addresses the comments before it. As described above, *supra* II.B.1, the FCC would have had to consider whether amending its rules would have better addressed the problem it was considering. Under a declaratory ruling or a rulemaking, it must reconcile its prior decision that some concealment elements should be protected. It must explain its change in analysis and the facts underlying the change.

The arguments in the FCC's brief, at 59-62, illustrate the problems that arise because the FCC refused to consider a rule change. A rulemaking could directly address how to treat a wall that is both a safety feature and a concealment technique. FCC 60-61. A rulemaking would have allowed stakeholders to suggest new codified text that would logically address the concern. Commenters pointed out the flaws

31

in this FCC's procedure, National League of Cities Comments at 3 (2-ER-244), but they were never given notice the FCC would change its rules. The FCC did not seek comment on rule changes and thus appropriate rule changes were not offered. Nor did the FCC explain why it did not use a rulemaking procedure when the parties sought one.

### B. The FCC's Shot Clock Ruling Arbitrarily Permits Automatic Approval of Modifications Without Compliance with Safety Rules and Standards.

Under the FCC's interpretation of the shot clock rule, a federal deemed granted permit will issue at the expiration of the shot clock, so long as the wireless company has demonstrated its modification meets the eligible facilities request's size rules and has taken the "first step" in the process and the local government fails to approve or deny the requested modification—and nothing else. In response to Petitioners' arguments that the shot clock rule is arbitrary and capricious, the FCC complains, at 37, that Petitioners do not define a filed application.[13] But the FCC's *Ruling* does not explain how local governments can insist wireless companies demonstrate compliance with existing health and safety rules, which the FCC acknowledged—as it must—that local

---

[13] *See* LOCC Reply at part II.A.

governments should enforce. *Ruling*, ¶ 23; *6409 Rulemaking*, 29 FCC Rcd. at ¶202, 12949-51; National League of Cities Comments 8-10 (companies should be required to show compliance with radio-frequency emission limits needed for EFRs) (2-ER-248-250).[14] The FCC rejected these requests and failed to address how its *Ruling* would enable local governments to be sure that the application would comply with existing health and safety rules that would otherwise be part of an application, creating ambiguity and confusion when local governments do their jobs.

---

[14] Nor does the FCC at 35, n.8 sufficiently address the interplay between its new ruling and the prior one. This claim, on brief, that one rule does not supersede the other does not appear in the *Ruling* and would be vulnerable to change in the future. *Supra* I.A.3.

51340.00001\41144100.4

## IV.   THE COURT SHOULD VACATE THE FCC'S RULING.

The Administrative Procedure Act requires the reviewing court to "hold unlawful and set aside agency action" which fails the statutory standard. 5 U.S.C. § 706(2). We respectfully request the court vacate the flawed *Declaratory Ruling* as requested herein.

Respectfully submitted,

By: _____ /s/ *Cheryl A. Leanza* _____
Cheryl A. Leanza
BEST BEST & KRIEGER LLP
1800 K Street N.W., Suite 725
Washington DC  20006
(202) 785-0600

Gail A. Karish
BEST BEST & KRIEGER LLP
300 South Grand Avenue, 25th Floor
Los Angeles, CA 90071
(213) 617-8100

*Counsel for Petitioners  in*
*Case No. 20-72749*

Dated:  March 31, 2023

34

**CERTIFICATE OF SERVICE**

I, Cheryl A. Leanza, hereby certify that on March 31, 2023, I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

March 31, 2023                                    /s/ Cheryl A. Leanza

51340.00001\41144100.4

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 20-72749 (Cons. w/ 20-71765 (L) and 20-72734)

I am the attorney or self-represented party.

**This brief contains** 6,639 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

⬜ it is a joint brief submitted by separately represented parties.
⬜ a party or parties are filing a single brief in response to multiple briefs.
⬜ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Cheryl Leanza **Date** 3/31/2023
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** Rev. 12/01/22

51340.00001\41144100.4