**Case No. 20-71765 (L)**
**(consolidated with Case Nos. 20-72734 and 20-72749)**

===

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

LEAGUE OF CALIFORNIA CITIES, *et al.*,
*Petitioners,*

v

FEDERAL COMMUNICATIONS COMMISSION *and*
UNITED STATES OF AMERICA,
*Respondents,*

————————

ON PETITION FOR REVIEW FROM AN ORDER
OF THE FEDERAL COMMUNICATIONS COMMISSION

————————

**REPLY BRIEF OF PETITIONERS LEAGUE OF CALIFORNIA
CITIES, *et al.*, PETITIONERS CITY OF SEATTLE, *et al.*, AND
INTERVENORS CITY OF THOUSAND OAKS, *et al.***

————————

Robert C. May III
Michael D. Johnston
Dr. Jonathan L. Kramer
**TELECOM LAW FIRM, PC**
3570 Camino del Rio North
Suite 102
San Diego, California 92108
(619) 272-6200
(619) 376-2300 (facsimile)

*Counsel for Petitioners and
certain Intervenors in No. 20-
71765, and certain Petitioners in
No. 20-72734*

Kenneth S. Fellman
**KISSINGER & FELLMAN, PC**
3773 Cherry Creek North Drive
Suite 900
Denver, Colorado 80209
(303) 320-6100
(303) 327-8601 (facsimile)

*Counsel for Intervenors in No. 20-
71765, and certain Petitioners in
No. 20-72734*

March 31, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioners respectfully submit the following corporate disclosure statements:

Petitioners the League of Oregon Cities; City of Beaverton, Oregon; City of Carlsbad, California; City of Cerritos, California; City of Concord, California; City of Coronado, California; City of Encinitas, California; City of Glendora, California; City of Hermiston, Oregon; City of Napa, California; City of Pleasanton, California; City of Rancho Palos Verdes, California; City of Richmond, California; City of San Marcos, California; City of San Ramon, California; City of Santa Cruz, California; City of Seattle, Washington; City of Solana Beach, California; City of South Lake Tahoe, California; City of Torrance, California; City of Tumwater, Washington; and Town of Danville, California, are each a governmental agency and therefore exempt from Rule 26.1.

Petitioner the League of California Cities is a nonprofit corporation that does not issue stock, has no parent corporation and is not owned in any part by any publicly held corporation.

1

Petitioner Colorado Communications and Utility Alliance ("CCUA") is a nonprofit corporation that does not issue stock, has no parent corporation and is not owned in any part by any publicly held corporation. CCUA is the Colorado chapter of the National Association of Telecommunications Officers and Advisors, and an affiliate of the Colorado Municipal League.

Intervenors City of Thousand Oaks, California; City of Coconut Creek, Florida; and Town of Breckenridge, Colorado, are each a governmental agency and therefore exempt from Rule 26.1.

| **TELECOM LAW FIRM, PC** | **KISSINGER & FELLMAN, PC** |
|---|---|
| s/ Robert C. May III | s/ Kenneth S. Fellman |
| Robert C. May III | Kenneth S. Fellman |
| *Counsel for Petitioners and certain Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734* | *Counsel for Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734* |

2

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT..............................................1

TABLE OF CONTENTS ........................................................................3

TABLE OF AUTHORITIES ....................................................................5

SUMMARY OF THE ARGUMENT ......................................................10

ARGUMENT ......................................................................................13

I. The Unreasonable Changes to Legislative Rules Through Interpretive Adjudication Deserve No Deference and Violate the APA's Procedural and Substantive Limits .........................................................13

    A. Reinterpretations Fall Well Outside Any Ambiguities in the Shot Clock Rules and Protections for Concealment Elements ...................13

        1. The *Ruling* Adopts Interpretations Foreclosed by the Shot Clock Rules' Plain Language and Overall Framework ..................14

        2. Attempts to Cabin Concealment Elements Contravene the Plain Language in the Rules............................................................15

    B. Cases Cited by the Commission as Support for Interpretive Authority Illustrate the Unreasonable Departures from the Legislative Rules in Section 1.6100 ....................................................18

II. The Plain Language of the Shot Clock Rules is Clear and Proscribes the Commission's Interpretation .........................................................20

    A. Any Interpretation that Would Commence the Shot Clock Without a Filed Application Is Inapposite to the Plain Language in the Rules and Violates the Canons of Construction............................21

    B. The FCC Continues to Arbitrarily and Capriciously Ignore the Customary Interpretation Offered by Petitioners in the Record........26

III. The Commission's Radical Departure from the Rules Protecting Concealment Elements and Concealment Conditions is Arbitrary and Capricious ......................................................................................28

    A. The FCC's Narrow Textual Arguments Fail to Consider the Important Context that Undermine Its Preferred Interpretation and Rely on Contradictory Examples........................................................29

        1. Arguments Against the Last-Antecedent Rule in this Case Misapply Supreme Court Precedent and Ignore Critical Context..29

2.     Absurdities from the FCC's Own Examples Support Invalidation ...................................................33

B.     The Commission's About Face on Protection for Concealment and Prior Conditions Lacks a Reasoned Explanation ...............................34

C.     The Commission Exaggerates Petitioners' Arguments to Support Textual Claims ...................................................35

D.     The FCC's Position on Its Prior Representations Before the Fourth Circuit, Like the *Ruling* Itself, Asks This Court to Endorse a Double Standard. ...................................................38

IV.   Reinterpretation of Equipment Cabinets is Arbitrary and Capricious Because it Lacks a Limiting Principle ...............................43

CONCLUSION ...................................................45

STATEMENT OF RELATED CASES ...................................................46

CERTIFICATE OF COMPLIANCE PURSUANT TO NINTH CIRCUIT RULE 32-1 ...................................................47

CERTIFICATE OF SERVICE ...................................................48

# TABLE OF AUTHORITIES

## CASES

*Ark. v. Okla.*,
    503 U.S. 91 (1992) .......................................................................... 20

*AT&T Corp. v. Iowa Utils. Bd.*,
    525 U.S. 366 (1999) ...................................................... 43, 44, 45

*Bassiri v. Xerox Corp.*,
    463 F.3d 927 (9th Cir. 2006) .......................................................... 38

*Burlington Truck Lines v. United States*,
    371 U.S. 156 (1962) ........................................................................ 35

*Facebook, Inc. v. Dugruid*,
    141 S. Ct. 1163 (2021) ............................................................ 30, 31

*Gordon v. Wells Fargo Bank, N.A. (In Re Krieg)*,
    951 F.3d 1299 (11th Cir 2020) ...................................................... 26

*Gunderson v. Hood*,
    268 F.3d 1149 (9th Cir. 2001) ................................................ 18, 19

*Hall v. USDA*,
    984 F.3d 825 (9th Cir. 2020) .......................................................... 32

*Hibbs v. Winn*,
    542 U.S. 88 (2004) .......................................................................... 23

*Jama v. Immigration and Customs Enf't*,
    543 U.S. 335 (2005) ........................................................................ 31

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ........................................................... *passim*

*Lane v. Salazar*,
    911 F.3d 942 (9th Cir. 2018) ................................................... 18, 19

*Lockhart v. United States*,
    136 S. Ct. 958 (2016) ...................................................................... 33

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ........................................................................ 33

*Montclair v. Ramsdell*,
    107 U.S. 147 (1883) ................................................................... 23, 24

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................... *passim*

*Perez v. Mortgage Bankers Ass'n*,
    575 U.S. 92 (2015) ......................................................................... 11

*Safe Air For Everyone v. United States EPA*,
    488 F.3d 1088 (9th Cir. 2007) ..................................................... 20

*SEC v. Chenery*,
    332 U.S. 194 (1947) ...................................................................... 16

*SNR Wireless LicenseCo., LLC v. FCC*,
    868 F.3d 1021 (D.C. Cir. 2017) .............................................. 42, 43

*T-Mobile S., LLC v. City of Roswell*,
    574 U.S. 293 (2015) ...................................................................... 25

*U.S. v. Nova Scotia Food Prods. Corp.*,
    568 F.2d 240 (2d Cir. 1976) ......................................................... 27

**STATUTES**

5 U.S.C. § 553 ...................................................................................... 11

47 U.S.C. § 271(d)(1) ........................................................................... 25

47 U.S.C. § 309(a)(1) ........................................................................... 25

47 U.S.C. § 332(c)(7)(B)(ii) ........................................................... 14, 25

47 U.S.C. § 549(c) ................................................................................ 25

6

47 U.S.C. § 1455(a) ............................................................ 43

47 U.S.C. § 1455(a)(1)......................................................... 18

**REGULATIONS:**

47 C.F.R. § 1.1114(a) .......................................................... 22

47 C.F.R. § 1.6100(b)(1) ...................................................... 17

47 C.F.R. § 1.6100(b)(4) ............................................. 17, 18, 32

47 C.F.R. § 1.6100(b)(7)(ii) .................................................. 30

47 C.F.R. § 1.6100(b)(7)(iii) ................................................. 36

47 C.F.R. § 1.6100(b)(7)(v)........................................... passim

47 C.F.R. § 1.610(b)(7)(vi) ............................................ passim

47 C.F.R. § 1.6100(c)...................................................... passim

47 C.F.R. § 1.6100(c)(1) ...................................................... 14

47 C.F.R. § 1.6100(c)(2) ........................................ 21, 23, 24, 28

47 C.F.R. § 1.6100(c)(3) ............................................. 14, 21, 24

47 C.F.R. § 1.746(a)............................................................22

**ADMINISTRATIVE DECISIONS:**

*In the Matter of Implementation of State And Local Governments'
Obligation to Approve Certain Wireless Facility Modification Requests
Under Section 6409(a) of The Spectrum Act of 2012*, Declaratory Ruling,
Wt Docket No. 19-250,
　　　　35 FCC Rcd. 5977 (Jun. 10, 2020).....................................*passim*

7

*In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, Declaratory Ruling, WT Docket No. 08-165, 24 FCC Rcd. 13994 (Nov. 9, 2009)................................................24

*In the Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, Report and Order, WT Docket No. 13-138, 29 FCC Rcd. 12865 (Oct. 17, 2014) ......................................*passim*

**MISCELLANOUS:**

FCC, FORM NO. 44: APPLICATION FOR CERTIFICATION AS AN ACCOUNTING AUTHORITY (ed. July 2008) ...............................................................................22

FCC, FORM NO. 301: APPLICATION FOR CONSTRUCTION PERMIT FOR COMMERCIAL BROADCAST STATION (ed. June 2018) ...............................................................................22

FCC, FORM NO. 301-CA: APPLICATION FOR AUTHORITY TO MAKE CHANGES IN A CLASS A TELEVISION BROADCAST STATION (ed. Aug. 2011) ...............................................................................22

FCC, FORM NO. 302-FM: APPLICATION FOR FM BROADCAST STATION LICENSE (ed. June 2002) ...............................................................................23

FCC, FORM NO. 302-DTV: APPLICATION FOR DIGITAL TELEVISION BROADCAST STATION LICENSE (ed. Jan. 2008) ...............................................................................23

FCC, FORM NO. 315: APPLICATION FOR CONSENT TO TRANSFER CONTROL OF CORPORATION HOLDING BROADCAST STATION CONSTRUCTION PERMIT OR LICENSE (ed. Sep. 2020) ...............................................................................23

Brief of Respondents, *Montgomery Cty. v. FCC*,
    811 F.3d 121 (4th Cir. 2015) (Nos. 15-1240, 15-1284).........................38

## SUMMARY OF THE ARGUMENT

After the *In the Matter of Implementation of State and Local Governments' Obligation to Approve Certain Wireless Facility Modification Requests Under Section 6409(a) of the Spectrum Act of 2012*, Declaratory Ruling, WT Docket No. 19-250, 35 FCC Rcd. 5977 (Jun. 10, 2020) ("*Ruling*"), legislative rules in Section 1.6100 (the "Rules") no longer mean what they say. For example:

- The Rules commence the shot clock when an application is filed, but the *Ruling* triggers the same limitations period after a "good-faith attempt" to submit "written documentation" that requests approval.

- The Rules protect all "concealment elements" but the *Ruling* denies those protections unless express evidence from the original approval shows the facility was designed to look like something other than a wireless facility.

- The Rules cap additional equipment cabinets at four per modification, but the *Ruling* abrogates the limit by excluding equipment housed in "small" boxes.

10

Agencies can change legislative rules by notice-and-comment rulemaking or use interpretive rules to clarify genuine ambiguities but cannot fundamentally alter legislative rules by adjudication. *See* 5 U.S.C. § 553; *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101 (2015). Petitioners showed in its principal brief that the *Ruling* failed to follow the prescribed procedure. Brief of Petitioners League of Calif. Cities, *et al.* ("LOCC") at 30-40. Despite the Commission's attempt to color its procedural error as harmless, the *Ruling*'s unreasonable interpretations earn no deference and should be invalidated as arbitrary and capricious.

**First**, the Commission's reliance on judicial deference is misplaced. No deference is due because the Commission's reinterpretations far exceed what the alleged ambiguities in Section 1.6100 (if any) might reasonably allow. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-16 (2019). Caselaw examples cited by the Commission are inapposite and instead contrast with the *Ruling* to illustrate its unreasonable departure from the Rules' plain text and framework.

**Second**, the Commission fails to offer a rational explanation for the reinterpretations. Justifications ignore express language in the

11

Rules, misapply interpretive cannons and related case law, exaggerate or overlook alternative interpretations offered by Petitioners' comments in the record and reveal a lack of subject-matter expertise. Accordingly, whether the procedural infirmities amount to harmless error or not, this Court should afford no deference to the Commission and invalidate the *Ruling* as arbitrary and capricious.

**_Finally_**, this Court should reject the Commission's argument that its statements in a brief to defend the Rules against petitions for judicial review do not matter. No case law supports this double standard. Agencies, like their rules, should mean what they say.

This Court should grant the petitions for review.

**ARGUMENT**

## I. THE UNREASONABLE CHANGES TO LEGISLATIVE RULES THROUGH INTERPRETIVE ADJUDICATION DESERVE NO DEFERENCE AND VIOLATE THE APA'S PROCEDURAL AND SUBSTANTIVE LIMITS

Reinterpretations in the *Ruling* turn legislative rules upside down, effectively amend the codified regulations, and deserve no deference. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415-2416 (2019). Although the Commission and its industry intervenor allies point to a pseudo notice-and-comment procedure and argue no-harm-no-foul, Brief of Respondents Fed. Commc'ns Comm'n, *et al.* ("FCC") at 28-33, Brief of CTIA, *et al.*, ("CTIA") at 54-60, these drastic changes are not supported by the plain text of the Rules they purport to clarify or the record.

### A. Reinterpretations Fall Well Outside Any Ambiguities in the Shot Clock Rules and Protections for Concealment Elements

No deference is due when an agency's interpretation exceeds what the ambiguity in the agency's regulation allows. *See Kisor*, 139 S. Ct. at 2415-2416 (2019). Ambiguities in 47 C.F.R. § 1.6100 (if any) would allow for only narrow elaborations and preclude the *Ruling*'s abrogation of local authority over the application process and protected concealment elements adopted by the Commission.

13

1.   **The *Ruling* Adopts Interpretations Foreclosed by the Shot Clock Rules' Plain Language and Overall Framework**

With respect to the shot clock Rules, the *Ruling* steps outside the lines twice: first, by allowing applicants to submit "written documentation" rather than an application; and second, by substituting a "duly filed" application with a "good-faith attempt" to submit.

The plain text, regulatory framework and manifest intent related to the shot clock Rules unambiguously show that the timeline for action commences "when the *application* is filed". 47 C.F.R. § 1.6100(c)(3) (emphasis added).[1] The Commission's completeness-review rules further acknowledge that local governments define the "application" and its contents. *See* 47 C.F.R. § 1.6100(c)(1) (acknowledging local authority to require an application); *id.* § 1.6100(c)(3) (tolling the shot clock when the "local government determines that the application is incomplete"); *In the Matter of Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, Report and Order, WT Docket No. 13-238, 29 FCC Rcd. 12865, ¶ 261 (Oct. 17, 2014) ("*2014*

---

[1] The shot clock Rules implement the statutory requirement that municipalities act within a reasonable time after a request for authorization is "duly filed". 47 U.S.C. § 332(c)(7)(B)(ii).

*Order*") (acknowledging that "local governments are best suited to decide what information they need to process an application"). Taken together, the shot clock Rules provide a straightforward framework: local authorities can develop and require applications and must act on them within specified timeframes after it receives a duly filed application.

Here, the *Ruling* adopts interpretations foreclosed by the shot clock Rules. Whereas the codified Rules preserve local authority to define the application and its contents, the *Ruling* allows applicants to submit "written documentation" instead. Whereas the statute and codified Rules require a duly filed application, the *Ruling* requires only a good-faith attempt to submit the written documentation. Although applications and filing procedures differ among municipalities, such variation does not expand any ambiguities to reasonably allow applicants to commandeer the form and manner in which it files applications.

### 2. Attempts to Cabin Concealment Elements Contravene the Plain Language in the Rules

Similar conflicts appear in connection with the *Ruling*'s efforts to curtail protections for concealment elements. For example, the

15

Commission's argument that the Rules do not protect concealment "in general" but only concealment elements "*of the eligible support structure*" is not just inconsistent with Section 1.6100(b) but also hopelessly circular. *See* FCC at 59 (emphasis in original). According to the Commission, mere placement techniques (such as setback requirements) are not elements of the structure that the Rules protect. *See* FCC at 59. This rationale does not appear in the *Ruling* and should be rejected as a post-hoc rationalization. *See SEC v. Chenery*, 332 U.S. 194, 196 (1947). Even if the Commission had invoked this basis in the *Ruling*, the Commission's distinction cannot withstand even modest scrutiny because placement techniques for the structure and equipment are quite naturally and literally elements of the tower or base station.

Only two limitations on "concealment elements" appear in the plain text of the regulation and the *2014 Order*: the concealment elements must be "existing" and "of the eligible support structure". *See* 47 C.F.R. § 1.6100(b)(7)(v); *2014 Order* at ¶ 188 (providing that a modification is substantial "if it would defeat the *existing* concealment elements of the tower or base station.") (emphasis added). The Rules broadly define an "eligible support structure" to include the structure

16

and, in some cases, the equipment associated with the structure. *See* 47 C.F.R. §§ 1.6100(b)(1), (4) (including "radio transceivers, antennas, coaxial or fiber-optic cable, regular and backup power supplies, and comparable equipment" at base stations in the definition). Thus, the Rules protect any existing concealment element associated with any existing tower or base station, including the structure and equipment.

The following examples illustrate how placement techniques qualify as concealment elements of the structure or equipment:

- Requirements to setback or lower antennas on a rooftop so that they cannot be seen from ground level, *see, e.g.*, 2-ER-236, is a concealment element "of the eligible support structure" because it is a restriction *of the base station and its equipment* that renders it effectively invisible from a common viewpoint.

- A setback requirement to hide a tower from view would be a concealment element "of the eligible support structure" because it is a setback *of the tower* from a given location.

In each example, the placement requirement is a concealment element of the eligible support structure because placement is inextricably linked to the structure or equipment to be concealed from view.

17

Accordingly, the Commission's interpretation excludes concealment elements that the Rules expressly include.[2]

## B. Cases Cited by the Commission as Support for Interpretive Authority Illustrate the Unreasonable Departures from the Legislative Rules in Section 1.6100

Although the Commission offers up examples where courts affirmed agency interpretations for its own rules, those cases bear little factual resemblance to the *Ruling*. Both *Gunderson v. Hood*, 268 F.3d 1149 (9th Cir. 2001), and *Lane v. Salazar*, 911 F.3d 942 (9th Cir. 2018), involve informal interpretations from adjudications to resolve disputes over how the Bureau of Prisons applies its own regulations. *See Gunderson*, 268 F.3d at 1152-53; *Lane*, 911 F.3d at 949. Moreover, interpretations in both those cases fell neatly within reasonable boundaries established by their respective legislative rules: *Gunderson*

---

[2] The Commission also claims that Petitioners' construction conflicts with the statute. *See* FCC at 61. This argument fails for the reasons stated above because the statutory text excludes modifications that "substantially change the physical dimensions of such *tower or base station*" and the Commission's definition for an "eligible support structure" merely encapsulates both towers and base stations. *Compare* 47 U.S.C. § 1455(a)(1), *with* 47 C.F.R. § 1.6100(b)(4). Moreover, the Commission previously acknowledged that Congress did not intend to undermine local concealment elements and conditions of approval "whether or not they affect the physical dimensions of the wireless tower or base station." *See 2014 Order* at ¶ 200 n.543.

interpreted ammunition (which contains explosive gunpowder) as an "explosive" that paroled felons cannot possess, and *Lane* interpreted a prisoner's letter to a prosecutor that expressed a desire to cause physical harm or death a punishable threat even if the prisoner lacked intent or ability to carry out the threats. *See Gunderson*, 268 F.3d at 1154-55; *Lane*, 911 F.3d at 949. Any reasonable person could comprehend that gunpowder explodes and an expressed potential for violence threatens.

In contrast, the *Ruling* turns the Rules inside out. To list a few: (1) shot clocks that commence after the "application is filed" can now start without filing an application through the appropriate procedure; (2) facilities intentionally designed to be effectively invisible and avoid detection are not "stealth" and therefore applicants may modify them to be readily detected; and (3) boxes that contain technological components count as "equipment cabinets", unless the box that contains functionally equivalent components is "small". Whereas the interpretations in *Gunderson* and *Lane* reasonably elaborate on a legislative rule, the *Ruling* contradicts and abrogates the Rules it purports to clarify.

19

No one would dispute that the Commission may reasonably interpret ambiguities in its own rules. However, as the Supreme Court made clear, interpretive authority goes only as far as the ambiguities allow and any interpretations that stray too far receive no deference. *See Kisor*, 139 S. Ct. at 2415-2416. This is such a case, and this Court should not afford deference to the *Ruling*'s interpretations.

## II.   THE PLAIN LANGUAGE OF THE SHOT CLOCK RULES IS CLEAR AND PROSCRIBES THE COMMISSION'S INTERPRETATION

The well-settled rules of statutory construction apply equally to agency regulations as they do legislation. *See id.* at 2415-2418. A court must first look to its plain language and give each word its ordinary and customary meaning. *Id.* "As with legislation, [a court must] presume the drafters said what they meant and meant what they said." *United States v. Bucher*, 375 F.3d 929, 932 (9th Cir. 2004) (quoting *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992)). If the regulation is unambiguous, its plain meaning controls unless such reading would lead to absurd results. *Id.*; *Safe Air for Everyone v. United States EPA*, 488 F.3d 1088, 1097 (9th Cir. 2007) ("[a]s a general interpretative principle, the plain meaning of a regulation governs.").

### A.     Any Interpretation that Would Commence the Shot Clock Without a Filed Application Is Inapposite to the Plain Language in the Rules and Violates the Canons of Construction

The Commission argues that it properly interpreted the phrase "submits a request" in 47 C.F.R. § 1.6100(c)(2) in tandem with the term "file an application" in 47 C.F.R. § 1.6100(c)(3). FCC at 36. But the argument that the terms are open to reasonable interpretation because they are subject to more than one meaning is nothing more than a post-*Ruling* allegation without any legal or factual basis. FCC at 34. The Commission states that the phrases "submits a request" and "file an application" may be properly interpreted as requiring only a "written request" that may or may not include the information needed to properly evaluate the request otherwise required by local codes and regulations. *Id.* The Commission, however, ignores the plain and customary language used in 47 C.F.R. § 1.6100(c)(3) to justify its improper "clarification" of the language in 47 C.F.R. § 1.6100(c)(2).

The Commission fails to recognize that the meaning of "when the application is filed" in Section 1.6100(c)(3) is plain on its face, and that there is thus no authority to interpret "submits a request" in Section 1.6100(c)(2) in a way that could commence the shot clock without a filed

application. In this context, an "application" cannot consist of nebulous "written documentation." *See Ruling* at ¶ 16 (1-ER-13). Oftentimes the formal request will be on a governmental form that identifies key information needed to open the application, collect fees and process the request to a final decision. 2-ER-262-64. Filing an application is the formal submission of the request for authorization through properly-defined channels (such as on a day that the agency is open and not on a government holiday).

Filing an application could not reasonably refer to something else. The Commission need look no further than its own procedures for the various authorizations it approves or denies to confirm that "file an application" means exactly what it says.[3]

---

[3] *See* 47 C.F.R. § 1.746(a) (authorizing the Commission to reject "defective" applications); *id.* § 1.1114(a)(1) (authorizing the Commission to dismiss an application if submitted without the appropriate fee); *see also* FCC, FORM NO. 44: APPLICATION FOR CERTIFICATION AS AN ACCOUNTING AUTHORITY (ed. July 2008), https://transition.fcc.gov/Forms/Form44/44.pdf ("No application can be granted unless all information requested is provided . . . [f]ailure to provide all requested information will delay the processing of the application or result in the application being returned without action."); FCC, FORM NO. 301: APPLICATION FOR CONSTRUCTION PERMIT FOR COMMERCIAL BROADCAST STATION (ed. June 2018), https://transition.fcc.gov/Forms/Form301/301.pdf; FCC, FORM NO. 301-CA: APPLICATION FOR AUTHORITY TO MAKE CHANGES IN A CLASS A

Even if a "filed application" did not have an obvious and customary meaning as used by government agencies nationwide (including the Commission) and as explained in the record, FER-6, this Court should reject the Commission's interpretation of Section 1.6100(c)(2) as arbitrary and capricious because it violates the rule against surplusage. Interpretations should "give effect, if possible, to every clause and word of a statute, avoiding, if it may be, any construction which implies that the legislature was ignorant of the meaning of the language it employed." *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute

---

Television Broadcast Station (ed. Aug. 2011), https://transition.fcc.gov/Forms/Form301-CA/301ca.pdf; FCC, Form No. 302-FM: Application for FM Broadcast Station License (ed. June 2002), https://transition.fcc.gov/Forms/Form302-FM/302fmjune02.pdf; FCC, Form No. 302-DTV: Application for Digital Television Broadcast Station License (ed. Jan. 2008), https://transition.fcc.gov/Forms/Form302-DTV/302dtv.pdf; FCC, Form No. 315: Application for Consent to Transfer Control of Corporation Holding Broadcast Station Construction Permit or License (ed. Sep. 2020), https://transition.fcc.gov/Forms/Form315/315.pdf ("[a]pplicants should provide all information requested by this application . . . . **Defective or incomplete applications will be returned without consideration**." (emphasis in original)).

should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .").

Here, adopting the Commission's interpretation of "submits a request" in Section 1.6100(c)(2) would render superfluous the directive in Section 1.6100(c)(3) that filing an application commences the shot clock. The Commission's new rule that a good-faith attempt to submit any written documentation that alleges a proposed modification is an eligible facilities request ("EFR") establishes a new obligation for local agencies to act on purported applications that bears no relationship to the kinds of forms that would be recognized as an application that requires processing.

The Commission's interpretation for Section 1.6100(c)(2) only makes sense if Section 1.6100(c)(3) is ignored or if the drafters are assumed to not know what a "filed application" meant in the permitting context. Both predicates contravene proper statutory and regulatory construction. *See Montclair*, 107 U.S. at 152. Likewise, the Commission's argument implies that Congress, whose members often previously served in local governments, shared the same ignorance when it commenced the timeframe for local review upon a "duly filed"

24

request for authorization. *See* 47 U.S.C. § 332(c)(7)(B)(ii). Throughout the Telecommunications Act of 1996 (the "Act"), Congress references an "application" and addresses application completeness issues numerous times.[4] Included among those references is 47 U.S.C. § 332(c)(7)(B)(ii), which provides the statutory basis for the shot clock rules and requires local authorities to act within a reasonable time after a request for authorization to place, construct or modify a wireless facility is "duly filed". Both the Commission and judicial precedent universally recognize that the "request" for authorization means an application to local authorities and the "reasonable time" commences when the application is filed. *See In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B)*, Declaratory Ruling, WT Docket No. 08-165, 24 FCC Rcd. 13994, ¶ 32 (Nov. 9, 2009); *see also T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 304-05 (2015). Congress is presumed to be fully aware of the customary meaning of the language

---

[4] *See, e.g.*, 47 U.S.C. § 549(c) (requiring the Commission to act within 90 days after "any application filed" for a waiver); *id.* § 271(d)(1) (describing the nature and content of applications for authorization to provide interLATA services); *id.* § 309(a)(1) (describing findings used to evaluate broadcast station licenses after the licensee "submits an application").

it codifies, including duly filed "requests" for authorization. Accordingly, the Commission's interpretation cannot be squared with the plain text and overall regulatory framework.

### B. The FCC Continues to Arbitrarily and Capriciously Ignore the Customary Interpretation Offered by Petitioners in the Record

The Commission inaccurately criticizes Local Government Petitioners for not offering an "alternative interpretation" of the term "file an application" as it relates to shot clock Rules. Petitioners demonstrated to the FCC the following customary definition in initial comments filed in the administrative proceedings below:

> [T]he phrase "duly filed" literally means to properly initiate a judicial or administrative proceeding by submitting the proper documents or following proper procedure. Any interpretation to mean an event less than actual submittal through the proper local procedures would directly conflict with the statute.

FER-6; *see also Gordon v. Wells Fargo Bank, N.A. (In re Krieg)*, 951 F.3d 1299 (11th Cir. 2020) ("duly filed" means an application which is clear from the face of the document that it is in the proper form required by the authority). The Commission's failure to consider and respond to these specific comments in the record supports the

Petitioners' claims that the Commission's "interpretations" of these regulations are arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983); *Ark. v. Okla.*, 503 U.S. 91, 113 (1992); see also *U.S. v. Nova Scotia Food Products Corp.*, 568 F.2d 240 (2d Cir. 1976) (regulation found to be arbitrary and capricious where agency failed to address alternative, better-reasoned recommendations on the record).

This "alternative interpretation"—really the only valid interpretation of plain and customary language—should come as no surprise to the Commission because it closely tracks the same practices and procedures the Commission affords itself when it receives applications for which it is responsible, *supra* Part II.A.

As noted above, this seemed like an obvious reading of the regulation's customary language when proposed in the record because the Commission would never accept a nebulous "written request" that may or may not contain all the information the Commission specifically requires to evaluate an application. FER-6. When the Commission is the agency receiving the request and being asked to act upon it, "application" means a request that contains all the information required

27

for evaluation. Because the Commission only considers applications that contain all the required information, a written request to an authority does not qualify as an "application" that demands formal evaluation until it includes all the information required by the authority that would qualify the application for review. The Commission's own internal system for applications demonstrates with clarity that the Commission's "interpretation" of Section 1.6100(c)(2) amounts to an interpretation that is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise."*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43-44 (1983).

## III. THE COMMISSION'S RADICAL DEPARTURE FROM THE RULES PROTECTING CONCEALMENT ELEMENTS AND CONCEALMENT CONDITIONS IS ARBITRARY AND CAPRICIOUS

The Commission arbitrarily and capriciously eliminated protections for facilities where community efforts to conceal the site and/or its equipment fall below "look[ing] like something other than a wireless facility." *Ruling* at ¶ 34 (1-ER-21). At the same time, the Commission placed new limitations on whether and how local governments enforce concealment conditions. Not only do these

28

"clarifications" turn the underlying Rules upside-down, *supra* Part I.A., but they also lack reasoned explanation.

## A. The FCC's Narrow Textual Arguments Fail to Consider the Important Context that Undermine Its Preferred Interpretation and Rely on Contradictory Examples

The *Ruling* eliminates codified protections for concealment elements by eroding what qualifies as concealment. To implement this strategy, the *Ruling* collapses the difference between "concealed" and "stealth-designed" facilities so that far fewer facilities with concealment elements qualify for protection under Section 1.6100(b)(7)(v). But to do so, the Commission ignores the context in which it promulgated these protections and relies on examples that undermine its position and cannot be explained away.

### 1. Arguments Against the Last-Antecedent Rule in this Case Misapply Supreme Court Precedent and Ignore Critical Context

The Commission contends that the limiting clause that defines the term "stealth-designed" facilities also applies to the term "concealed" facilities because both terms modify the same noun. FCC at 57. Whether the last-antecedent rule should be used to interpret statutes or regulations depends on the context, including the words and sentence

29

structure itself and the circumstances around their adoption. *See Facebook, Inc. v. Dugruid*, 141 S. Ct. 1163, 1170 (2021). Cases relied upon by the Commission show that the last-antecedent rule should be applied, and protections for concealment elements are preserved for more than just "stealth-designed" facilities.

**First**, reliance on the Supreme Court's decision in *Facebook* to dispense with the last-antecedent rule is misplaced. *See id.* at 1170. The Supreme Court shelved the last-antecedent rule in *Facebook* because its application would restrict activities that promote autodialers and undermine Congressional intent to limit such activities. *See id.* The context in which Congress adopted the statutory text informed whether the last-antecedent rule helped or harmed the legislative goals.

Here, the Commission's refusal to apply the last-antecedent rule turns Congressional intent upside down. The sentence that the Commission claims collapses "concealed" and "stealth-designed" facilities appears in the same paragraph where the Commission recognizes Congress' intent to broadly preserve concealment elements, even when a proposed modification does not change a facility's physical dimensions. *See 2014 Order* at ¶ 200 n.543 (noting that Congress "did

30

not intend to exempt [EFRs] from compliance with [concealment] elements or to undermine such [concealment] conditions"). Whereas the context in *Facebook* required the Supreme Court to dispense with the last-antecedent rule to match legislative limits on autodialers, the context in this case compels the Commission to apply the last-antecedent rule to match legislative protections for existing concealment. *See Facebook*, 141 S. Ct. at 1170.

**Second**, the Commission's reliance on *Facebook* also overlooks important differences in sentence structure and punctuation that affect meaning. The sentence in *Facebook* uses a clause set off by commas, whereas the sentence in the *2014 Order* uses heavy punctuation and an abbreviated signal for a limiting clause. *Compare Facebook*, 141 S. Ct. at 1170, *with 2014 Order* at ¶ 200. Punctuations, like the words themselves, matter. *See Facebook*, 141 S. Ct. at 1170 (considering a limiting clause setoff by commas as modifying the entire list); *Jama v. Immigration and Customs Enf't*, 543 U.S. 335, 344 (2005) (considering a limiting clause in a list with terminal punctuation as modifying only the last antecedent). Em dashes operate like parenthesis and the content within em dashes elaborate on the word or phrase that precedes the

setoff. *See* LOCC at 38-40; 2-ER-202-04. Accordingly, the most natural way to read the phrase "—*i.e.*, facilities designed to look like something other than a wireless tower or base station—" that is both set off by heavy punctuation and the abbreviation for a limiting clause is as a note that elaborates on "stealth-designed"—the last antecedent.

***Finally***, no "other indicia of meaning" overcomes the more natural construction offered by Petitioners. Although the Commission notes that the *2014 Order* refers to "concealment elements of stealth-designed facilities" (FCC at 57 n.12 (quoting *Hall v USDA*, 984 F.3d 825, 836 (9th Cir. 2020)), the codified Rules—adopted after the *2014 Order* and carrying the force of law—more directly indicate meaning and refer broadly to "concealment elements of the eligible support structure". 47 C.F.R. § 1.6100(b)(7)(v); *see id.* § 1.6100(b)(4) (defining "eligible support structure" as "any [existing] tower or base station"). "[I]t takes more than a little mental energy to process" the FCC's interpretation that concealment elements exist only on "stealth-designed" facilities, especially when Section 1.1600(b)(7)(v)'s plain text and the Commission's original legislative-intent analysis cut the other

way. *See Hall*, 984 F.3d at 838 (quoting *Lockhart v. United States*, 136 S. Ct. 958, 963 (2016)) (internal quotations omitted).

Petitioners described these fundamental inconsistencies between the *2014 Order* and the proposed interpretations offered by industry intervenors, *see* 2-ER-292-296, and those ultimately adopted by the Commission, *see Ruling* at ¶ 32-40 (1-ER-20-25), but the Commission failed to consider this relevant factor. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 376 (1989).

## 2. Absurdities from the FCC's Own Examples Support Invalidation

Although the *Ruling* claims to limit concealment elements to only those facilities designed to look like something other than a wireless tower or base station, the Commission offers up internally inconsistent examples without a rational connection to the facts found. *See State Farm*, 463 U.S. at 43. According to the Commission, *see* FCC at 55-56, equipment "paint[ed] to match the supporting facade" or placed within "artificial tree branches" qualify as "stealth" facilities but equipment intentionally placed and conditioned to remain completely hidden from view behind existing structures do not. Likewise, the Commission finds that requirements to hide equipment behind a fence do not count as

"stealth" even though such equipment would be completely obscured from view and therefore be designed to look like something other than a wireless facility. *See id.* at 58.

How can painted equipment bolted to an exterior wall be stealth but equipment hidden behind a wall be less-than stealth? If the Commission's examples illustrate anything, it is that the driving force behind the new limits on concealment elements is that the ends justify the means—a "clear error in judgment." *See State Farm*, 463 U.S. at 43. This Court should not afford these unreasonable interpretations any deference and should strike them down as arbitrary and capricious.

## B. The Commission's About Face on Protection for Concealment and Prior Conditions Lacks a Reasoned Explanation

The Commission fails to adequately explain its interpretation that conditions under Section 1.6100(b)(7)(vi) are subject to the size-related thresholds for a substantial change. The arguments (FCC at 65-66) that concealment elements on non-stealth facilities do not merit protection under Section 1.6100(b)(7)(v) does not square with its prior interpretation that "*Congress did not intend to exempt covered modifications from compliance with such [concealment] elements and*

34

*conditions* . . . ." LOCC at 42 (quoting *2014 Order* at ¶ 200 n.543). Yet the *Ruling* does exactly what the Commission said Congress did not intend: "to exempt covered modifications from compliance with such [concealment] elements and conditions . . . ." *See id.*

Although the Commission explains in a footnote that its prior statement merely describes why it construed the statutory phrase "physical dimensions" to include concealment, it does not explain why the Commission removes protections for concealment conditions that it believes Congress intended the statute to protect. *See* FCC at 65 n.15. The best the Commission offers is that its reinterpretation of concealment elements justifies the reinterpretation that concealment conditions are subject to the size-based criteria for a substantial change. This gap in the Commission's explanation severs any "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)) (internal quotations omitted).

## C. The Commission Exaggerates Petitioners' Arguments to Support Textual Claims

FCC arguments that Petitioners' construction would make Sections 1.6100(b)(7)(v) and (vi) redundant depend on two exaggerated

claims that: (1) Petitioners' construe *anything* that helps hide a wireless facility as a concealment element; and (2) all permit conditions related to physical dimensions relate to concealment. *See* FCC at 58-61. Both FCC overstatements are inaccurate.

**First**, the Commission exaggerates Petitioners' position, claiming that Petitioners contend that anything that "hides facilities from view" must be treated as a concealment element. *See, e.g.*, FCC at 59. In fact, Petitioners stated that "nothing in the [*2014 Order*] cabins concealment elements to 'stealth facilities' . . . ." LOCC at 67-68. The Rules, the *2014 Order* and the record before the Commission all support the proposition that Section 1.6100(b)(7)(v) protected conscious efforts to conceal wireless facilities and equipment, whether those efforts resulted in a fully stealth facility or not. *See* LOCC at 32-40.

**Second**, not all permit conditions with restrictions on physical dimensions relate to concealment. *See* 2-ER-309 (suggesting that safety clearance conditions would limit or restrict placement of an emergency generator). For example, a condition to maintain compliance with the zone height imposed on an unpainted, unshrouded and otherwise concealed tower could be preempted under Section 1.6100(b)(7)(vi) as

36

inconsistent with the threshold in Section 1.6100(b)(7)(ii) and not saved under Section 1.6100(b)(7)(v). In contrast, setback conditions to maintain light, airflow, clearance between and access to the underlying properties would be protected under Section 1.6100(b)(7)(vi) because they reasonably relate to public health and safety even though such restrictions on physical dimensions were not intended to promote concealment. *See* 2-ER-309-15 (providing examples of setbacks for non-concealment purposes). To be sure, communities do include concealment elements in permit conditions. But the fact that some conditions of approval restrict physical expansions and memorialize material concealment elements does not render Section 1.6100(b)(7)(vi) a dead letter. *See* FCC at 60-61.

Without these exaggerations, the Commission's justifications that any other constructions would cause Sections 1.6100(b)(7)(v) and (vi) to cancel each other out fall apart. As shown by the examples, above "clarifications" were not necessary to avoid provisions "devoid of

meaningful effect" as the Commission claims. *See* FCC at 61 (quoting *Bassiri v. Xerox Corp.*, 463 F.3d 927, 932 (9th Cir. 2006)).[5]

### D. The FCC's Position on Its Prior Representations Before the Fourth Circuit, Like the *Ruling* Itself, Asks This Court to Endorse a Double Standard.

Responses by the Commission and its industry intervenors to the FCC counsel's prior statements that contradict the *Ruling* neatly summarize the deficiencies in the Commission's reinterpretations and related justifications. *See* FCC at 62-64; CTIA at 35-36; Brief of Respondents, *Montgomery Cty. FCC*, 811 F.3d 121 (4th Cir. 2015) (Nos. 15-1240, 15-1284) ("2015 Brief").[6] Respondents and their allies first assert that the 2015 Brief does not address the issues before this Court; then attempt to align contradictory positions between the 2015 Brief and *Ruling*; and, finally, contend that whatever the FCC legal counsel

---

[5] The Commission's reliance on *Bassiri* is misplaced. Unlike Xerox's proposed interpretations that would "obliterate" payroll practices exceptions under ERISA, 463 F.3d at 932, Petitioners' construction would continue to include situations where a restriction on increased physical dimensions unrelated to concealment would be preempted under Section 1.6100(b)(7)(vi).

[6] In that brief, the Commission's counsel explained how a hypothetical modification that extends a previously hidden fake tree over the tree line would result in a substantial change and restore local discretionary authority. *See* 2015 Brief at 40-41.

said to convince the Fourth Circuit to uphold the *2014 Order* does not matter because staff actions cannot bind the Commission.

**First**, the 2015 Brief's conclusion that extending a fake tree over an existing tree line restores municipal discretion shows the Commission cannot defend its reinterpretations for both Sections 1.6100(b)(7)(v) and (vi). Section 6409 and the Rules remove local discretion unless the proposed modifications cause a substantial change, such as defeating an existing concealment element or violating a prior condition on the existing facility.[7] If the extension over the tree line defeated a concealment element as the Commission represented to the Fourth Circuit in 2015, this directly contradicts the Commission's reinterpretation that "careful placement conditions" cannot be concealment elements. FCC at 56. If the extension violated a prior condition, the rule as understood by the Commission in 2015 directly contradicts the reinterpretation that any condition to mitigate visual

---

[7] *See, e.g.*, *Montgomery Cty. v. FCC*, 811 F.3d 121, 125 (4th Cir. 2015) ("[Section 6409] forbid[s] localities from exercising their zoning authority . . . so long as the proposed modification does not 'substantially change the physical dimensions' of the facility"); 47 C.F.R. § 1.6100(c) (mandating approval for an EFR that does not cause a substantial change).

impacts are subordinate to the ability to expand within the size-related threshold. *Id.* at 60-61. Although the 2015 Brief did not address which substantial-change criteria the height increased violated, that such a modification would amount to a substantial change compels the conclusion that at least one assault on concealment protections in the *Ruling* cannot be squared with how the FCC previously construed Section 6409. The Commission's course change from recognizing a broader scope of local land use authority in 2015 to the *Ruling* amounts to both a substantive change in the Rules without following APA procedures and an arbitrary and capricious failure to explain the basis for the change.

The industry intervenors' attempt to characterize the Commission's interpretations in the 2015 Brief as inconsistent with Section 6409 and therefore immaterial. CTIA at 36. This argument ignores the fact that protections for concealment elements and concealment conditions enshrined in the legislative Rules and defended in the 2015 Brief stem from the Commission's determination that Congress intended to preserve existing concealment. *See 2014 Order* at ¶ 200 n.543. Moreover, after considering the 2015 Brief, the Fourth

Circuit upheld protections in the Rules for concealment elements and concealment conditions as reasonable interpretations for ambiguities in Section 6409. *Montgomery Cty.*, 811 F.3d at 131. Petitioners agree that an agency's interpretive authority ultimately turns on fidelity to the scope allowed by a statute's ambiguity, but the industry intervenors' contentions that the tree-line hypothetical in the 2015 Brief conflicted with Section 6409 lacks merit.

***Second***, the 2015 Brief's tree line example is not "generally consistent" with the *Ruling*'s fence example. *Contra* FCC at 63. Both the tree line and fence line examples involve essentially the same issue (*i.e.*, concealment defeated by height increases). But the similarities end there.

Whereas the 2015 Brief conceded that extending a fake tree over the tree line would restore local discretionary authority, the *Ruling* suggests that the applicant build a taller fence rather than restore discretion to the locality. *Compare* 2015 Brief at 40-41, *with Ruling* at ¶ 44 (1-ER-26-27). But the suggestion to build a taller fence in the *Ruling* would be required only if: (1) some "express evidence" contemporaneous with the original approval shows the fence was intended to conceal the

41

equipment on the other side (and not merely for security); and (2) the obligation to build a taller fence would not ultimately prevent the height extension. *See Ruling* at ¶¶ 42-44 (1-ER-25-27). The differences in the two examples show a clear shift in the Commission's approach: the tree line example showed circumstances that preserved local discretion and the Commission's new fence line example would not. The Commission's claims that nothing has changed are inexplicable.

*Finally*, it is difficult to underestimate the impact on this and future legal proceedings if the Commission's contention—that what its counsel says to convince a federal court does not matter—is accepted by the Court. FCC at 64-65. If left unchecked, the Commission would be free to bring arguments before courts to support the relief it requests, while at the same time preserving arguments before a future court that its prior representations did not represent the Commission's position. Those arguments put before the court may have been written by staff attorneys but were approved by the Commission, no different than a *Ruling* written by staff and approved by the Commission. Moreover, this case is not like *SNR Wireless*, which involved unreasonable reliance by auction participants on a reference to a bureau-level adjudication.

42

*SNR Wireless LicenseCo., LLC v. FCC*, 868 F.3d 1021, 1038-39 (D.C. Cir. 2017); *see also* LOCC at 65-66. Here, municipalities would reasonably expect that the Commission's attorneys—who speak for the Commission in the judicial review process—would only express positions endorsed by the Commission.

## IV. REINTERPRETATION OF EQUIPMENT CABINETS IS ARBITRARY AND CAPRICIOUS BECAUSE IT LACKS A LIMITING PRINCIPLE

The *Ruling* eliminates the limiting principle in both the statute and the codified rule. Congress established the limiting principle through the "substantial change" standard and the Commission implemented this limitation with respect to equipment cabinets through limits how many (and sometimes how large) new equipment cabinets could be installed on a per-modification basis. *See* 47 U.S.C. § 1455(a); 47 C.F.R. § 1.6100 (b)(7)(iii). Any interpretation that would eliminate the limiting principle contravenes the statute and the codified rule. *See AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 389 (1999) (invalidating FCC rule that allowed competitive entrants to determine which network elements were "necessary" for their use).

Although the Commission claims that its interpretation retains a limit on equipment cabinets, FCC at 51-52, the *Ruling* does an end-run

43

around the limit by exempting "small" equipment cabinets from the rule. This reinterpretation should be struck down as arbitrary and capricious as it ignores important facts about the problem and abrogates the limiting principle within the rule itself. *State Farm*, 463 U.S. at 43.

Rather than provide a definition for equipment cabinet, the Commission merely asserts what is not an equipment cabinet because the enclosure around the equipment is for "smaller, distinct devices." *See Ruling* at ¶ 12 (1-ER-11). Equipment cabinets vary in three-dimensional configuration and weight, and the administrative record identified substantial impacts that would result from unlimited "small" equipment cabinets. *See* 2-ER-297-98. Rather than consider these impacts and whether the reinterpretation would contravene the limiting principle established by Congress and implemented by the codified rule, the Commission shrugs off the issue by characterizing the concern as involving "hypothetical outlier cases". *See* FCC at 52.

But the Commission's dismissal misses the point that the reinterpretation opens a loophole around the limiting principle in the statute and codified rule. Just as the Supreme Court in *Iowa Utils. Bd.*

struck down the Commission's interpretation that ignored the limiting principle in the statute, this court should find that that the Commission arbitrarily and capriciously ignored the limiting principle in Section 6409 and the Rules' thresholds for new equipment cabinets. *See Iowa Utils. Bd.*, 525 U.S. at 389.

## CONCLUSION

For the reasons stated above, Court should grant the petitions for review.

Date: March 31, 2023

Respectfully submitted,

| **TELECOM LAW FIRM, PC** | **KISSINGER & FELLMAN, PC** |
|---|---|
| s/ Robert C. May III | s/ Kenneth S. Fellman |
| Robert C. May III | Kenneth S. Fellman |
| *Counsel for Petitioners and certain Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734* | *Counsel for Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734* |

## STATEMENT OF RELATED CASES

Pursuant to Circuit Rule 28-2.6, Counsel state that: (1) the *Ruling* has not been subject to review by this Court or any other court; (2) all petitions for judicial review related to the *Ruling* have been consolidated before this Court; and (3) Counsel is not aware of any other cases raising the same or closely related issues pending before this Court.

s/ Robert C. May III
Robert C. May III

*Counsel for Petitioners and certain Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*

s/ Kenneth S. Fellman
Kenneth S. Fellman

*Counsel for Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*

## CERTIFICATE OF COMPLIANCE PURSUANT TO NINTH CIRCUIT RULE 32-1

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this brief complies with the applicable type-volume limitation permitted by Ninth Circuit Rule 32-1. This brief was prepared in Century Schoolbook 14-point font and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5), as well as the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

Except for the portions exempted by Federal Rule of Appellate Procedure 32(f), this brief contains 6,631 words. This certificate was prepared in reliance on the word-count function in the word-processing application (Microsoft Word for Microsoft 365) used to prepare this brief.

s/ Robert C. May III
Robert C. May III

*Counsel for Petitioners and certain Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*

s/ Kenneth S. Fellman
Kenneth S. Fellman

*Counsel for Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*

47

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be filed electronically the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on March 31, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

s/ Robert C. May III
Robert C. May III

*Counsel for Petitioners and certain Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*

s/ Kenneth S. Fellman
Kenneth S. Fellman

*Counsel for Intervenors in No. 20-71765, and certain Petitioners in No. 20-72734*